UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| JUANE T. KENNELL, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. 4:09-CV-407 AGF |
| | ) |
| DAVE DORMIRE, | ) |
| | ) |
| Defendant. | ) |

## PETITIONER'S SUPPLEMENTAL TRAVERSE

COMES NOW petitioner, Juane Kennell, by and through counsel, and pursuant to this Court's recent order, submits the following supplemental traverse in support of his petition for a writ of habeas corpus.

## I.

## INTRODUCTION

In this supplemental traverse, petitioner intends to address the merits of his *Brady v. Maryland*, 373 U.S. 83 (1963) claim in light of three intervening developments since his original traverse was filed. First, this traverse will address additional evidence that has emerged from the court ordered discovery and petitioner's independent investigation that significantly strengthens petitioner's *Brady* claim. Second, this traverse will address legal and factual flaws underlying this Court's memorandum, order, and judgment issued on September 16, 2014 in codefendant Christopher White's habeas corpus action that denied Mr. White relief

on his similar *Brady*/*Giglio* claim.  *See White v. Steele*, No. 4:08CV00288AFG (Doc. 73) ("*White* Doc. 73").  Finally, petitioner will address whether, based upon the existing evidence and applicable law, he is entitled to an evidentiary hearing before this Court on his *Brady* claim.

The additional evidence that has come to light undoubtedly strengthens petitioner's *Brady* claim.  A written plea agreement, discovered in the prosecution's files, clearly indicates that Jeffrey Shockley was offered probation on his pending charges in exchange for his testimony against Mr. Kennell and Mr. White.  (See Exh. 8).  The affidavits of investigator David Haubrich and Jerome Johnson also substantiate the other compelling circumstantial and direct evidence that Mr. Shockley had no fear of going to jail on his pending charges if he agreed to testify for the prosecution against Mr. Kennell and Mr. White.  In addition, Robert Stewart indicated that he and Mr. Shockley committed perjury when they positively identified Kennell and White in a lineup and at trial as the shooters and Stewart did so after being coached by Jeffrey Shockley.  (See Exh's 7, 9).

Mr. Johnson's affidavit provides further proof that the state suppressed exculpatory and impeaching evidence regarding Mr. Kennell's possession of a 9mm Glock after the shooting of Freddie Chew that could have been the murder weapon.  (See Exh's 2, 9).  The disclosure of this evidence would have established Mr. Shockley lied when he testified at trial that he disposed of the Glock he

2

possessed and fired on the date Mr. Chew died and never subsequently retrieved it. (Tr. 552).

This evidence, coupled with the evidence already presented in support petitioner's *Brady* claim, seriously undermines the reasoning and conclusions set forth in this Court's memorandum and order denying habeas relief in Mr. White's case. This evidence provides much more than a "hint" of a deal. *See Douglas v. Workman*, 560 F.3d 1156, 1186 (10th Cir. 2009). A plea bargain was in fact offered and strong circumstantial evidence suggests that Mr. Shockley's trial counsel, Robert Taafe advised him not to formally accept this offer because that would be the worst outcome that could possibly occur if he testified as a prosecution witness. In this regard, this Court in the *White* order mentions that Mr. Taafe's own handwritten notes in the public defender files indicated that a dismissal or "nolle" of the charges was a strong possibility if Mr. Shockley testified against White and Kennell. (*White* Doc. 73, p. 14). This additional evidence also seriously undermines this Court's conclusion in *White* that the undisclosed exculpatory evidence was not material. *See Horton v. Mayle*, 408 F.3d 570, 578-581 (9th Cir. 2005) (finding undisclosed evidence demonstrating that a key witness "had an interest in fabricating his testimony" due to an understanding with the prosecution for immunity was material under *Brady*.)

3

Finally, this Court's ruling in its most recent order in petitioner's case that Mr. Kennell cannot obtain a hearing unless he presents evidence that he is innocent under 28 U.S.C. § 2254(e)(2)(B) is legally unsound. (See Doc. 79, p.5). It is well settled that this provision of 2254(e) only comes into play where a claim was raised in state court but significant evidence supporting it was not discovered or presented in state court because of the prisoner's lack of diligence. In this case, where the claim was never raised in state court and cause to overcome this procedural default is established, (see *White* Doc. 73, p.12) it is clear that a habeas petitioner can obtain an evidentiary hearing without having to overcome any of 2254(e)'s procedural hurdles. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 420, 430-434 (2000) (finding that "failed to develop" language of 2254(e)(2) requires showing a lack of diligence.)

An evidentiary hearing will resolve any possible doubt whether Mr. Shockley expected leniency on his pending charges in exchange for his testimony. The testimony of Mr. Shockley, his attorney, the prosecutor, and others will remove any doubt that a tacit agreement existed. The common denominator of all the recent successful *Brady* cases previously cited and cited below was that the prisoner was provided a hearing and therefore received a full and fair opportunity to develop and prove his claim. *See, e.g.*, *Banks v. Dretke*, 540 U.S. 668 (2004). Mr. Kennell deserves the same opportunity.

4

## II.

## THE CURRENT RECORD ESTABLISHES THAT THE STATE SUPPRESSED MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE

Before discovery was ordered, there were three compelling pieces of evidence indicating that the state withheld material exculpatory and impeaching information from petitioner in violation of their obligation of disclosure required by the due process clause of the Fourteenth Amendment under *Brady*. First, the attached internal memorandum from the public defenders' office established that a conflict of interest existed requiring that office to remove themselves from Mr. Kennell's case because assistant public defender Robert Taafe had worked out a "deal" for Jeffrey Shockley to testify against Mr. Kennell and Mr. White. (See Exh. 10). Second, the court was provided with a copy of the transcript of Mr. Shockley's guilty plea to drug and weapons charges in which he received a suspended imposition of sentence ("SIS") and one year of unsupervised probation. (See Exh. 1). The trial court in Shockley's case also took the unprecedented move of waiving all court costs, drug testing, and fees. (*Id.*, p. 13). In addition, this transcript revealed that the state had paid Mr. Shockley's expenses to move to another neighborhood before he testified against Mr. Kennell and Mr. White. (*Id.*, pp. 9-10)

Third, petitioner provided the court with undisclosed police reports from a July 1, 2002 arrest where Mr. Shockley and Mr. Stewart were linked to a 9mm Glock handgun found in a car in which they were passengers.  (See Exh. 2). Subsequent ballistic testing linked this weapon to the crime scene of the Freddie Chew murder.  (*Id.*).

As noted earlier, during the discovery process in this proceeding and through independent investigation, further evidence has come to light that removes any serious doubt that Mr. Shockley had a tacit agreement with the prosecution for either probation or an outright dismissal of his pending charges if he agreed to testify against Mr. Kennell and Mr. White.  There was an unsigned plea agreement found in the prosecution's file setting forth terms of an agreement for Mr. Shockley to receive probation and a SIS if he agreed to testify against petitioner and his codefendant.  (See Exh. 8).

Investigator David Haubrich also provided an affidavit concerning his 2012 interview with Robert Stewart in a Florida jail.  (Exh. 7).  Mr. Stewart indicated that he and Shockley perjured themselves at trial when they positively identified Mr. White and Mr. Kennell as being involved in the murder of Freddie Chew. (*Id.*).  Mr. Stewart also told Mr. Haubrich that improprieties occurred during the pretrial identification procedure where Mr. Shockley coached him into identifying

6

White and Kennell.  (*Id*.).  Finally, Mr. Stewart also corroborated the fact that Mr. Shockley had a deal with the prosecution.  (*Id*.).

Finally, Jerome Johnson provided an affidavit that corroborates the fact that, when he, Shockley, and Stewart were subsequently arrested on July 1, 2002 and the 9mm Glock was found in the car, this weapon belonged to Mr. Shockley.  (Exh. 9).  Mr. Shockley attempted to frame him for possession of this weapon and he believed Shockley became an informant against him.  (*Id*.).

Although this Court refused to turn over any documents to petitioner's counsel from the public defender files that were reviewed *in camera*, the court's order in *White* denying habeas relief indicates that Mr. Shockley's attorney, Robert Taafe, indicated in his notes that he believed a dismissal of the charges could occur if Mr. Shockley testified against White and Kennell.  (*White* Doc. 73, p.14).  All of this evidence, viewed in the aggregate, clearly reveals that the prosecution and the police suppressed evidence that was favorable to Mr. Kennell's defense.  Had Mr. Kennell's jury heard that Mr. Shockley had, at the very least, a tacit agreement for either probation or an outright dismissal of his charges if he testified against Mr. Kennell, coupled with his payment for moving expenses and evidence linking him to the possible murder weapon, this evidence would have completely altered the jury's perception of his credibility.  *See State v. Clark*, 364 S.W.3d 540, 544-545 (Mo. banc 2012) (finding reversible error where trial court precluded defendant

7

from eliciting evidence of a key witness' hope for leniency on pending charges in exchange for his testimony.) In addition, the police report involving the Glock and corroborated by Mr. Johnson's affidavit also indicated that Mr. Shockley committed perjury when he told the jury that he disposed of the Glock and did not retrieve it after Freddie Chew was shot. (Tr. 552).

In its recent order, this Court discounted the relevance of Mr. Stewart's statements to Mr. Haubrich and the Jerome Johnson affidavit. Specifically, the court stated that Stewart's statement that neither he nor Shockley could identify Kennell and White had "no bearing on Kennell's *Brady* claim." (Doc. 79, p. 3). It cannot be seriously disputed that Stewart's admissions that neither he nor Shockley could positively identify the shooters are relevant to the *Brady* materiality calculus in determining whether the jury's guilty verdict was worthy of confidence. Other Missouri courts have held that similar newly discovered evidence, such as a recantation of a key witness, must be considered in conjunction with the *Brady* evidence in determining whether a new trial is warranted. *See State ex rel. Griffin v. Denney*, 347 S.W.3d 73, 77 (Mo. banc 2011); *State ex rel. Woodworth v. Denney*, 396 S.W.3d 330, 345 (Mo. banc 2013).

This Court also unreasonably discounted the importance of the written unsigned plea agreement in which the state formally offered Mr. Shockley probation if he agreed to testify against Kennell and White. This Court apparently

8

found it significant that this plea agreement was not formally accepted. (See Doc. 79 at p.3).

The Supreme Court has never limited *Brady* violations to cases where the facts demonstrate that the state and the witness have reached a bona fide enforceable contract or deal for a specific disposition for the witness's pending charges. In *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court explained that the key question is not whether the prosecutor and the witness entered into an effective and binding agreement, but whether the witness might have believed that the state was in a position to implement any promise of consideration. *Id*. at 270. *See also Giglio v. United States*, 405 U.S. 150, 154-155 (1972). It is clear under Supreme Court precedent that "evidence of any understanding or agreement as to a future prosecution would be relevant to the witness's credibility." *Id*. at 155. As the Fifth Circuit noted in a similar case, the key issue is not whether "the promise was indeed a promise." The key question is "the extent to which the testimony misled the jury." *Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008).

In the recent *White* decision, this Court did not have the benefit of all of this evidence in assessing the materiality arising from the *Brady/Giglio* violation involving Jeffrey Shockley. Apart from the overwhelming evidence of a tacit agreement for leniency, this Court overlooked the fact that was brought out in the guilty plea transcript that the prosecutors paid Mr. Shockley for his moving

9

expenses to move to a different neighborhood prior to his trial testimony against Mr. White and Mr. Stewart.  This evidence of payment is *Brady* material that should have been disclosed.  *See Banks v. Dretke*, 540 U.S. 668, 685, 698 (2004).

The facts surrounding petitioner's *Brady/Giglio* claim involving Mr. Shockley bear remarkable similarities to the facts confronted by the Missouri Supreme Court in *State ex rel. Engel v. Dormire*, 304 S.W.3d 120 (Mo. banc 2010).  In *Engel*, as here, the prosecution failed to disclose to Engel's trial counsel that its star witness had received informal promises of leniency and monetary payments in exchange for his cooperation and testimony at Engel's trial.  Like this case, the prosecution after Engel's trial made efforts to obtain leniency for the key prosecution witness to secure an early release from prison for him.

In light of these facts, the Missouri Supreme Court had little difficulty in finding a *Brady* violation occurred and, in light of the lack of physical evidence and the weakness of the prosecution's case, that the excluded impeachment information was material.  The court in *Engel* found that the excluded evidence was material under *Brady* despite the fact that a second witness also implicated Engel in the crimes for which he was convicted.  *Id*. at 128-129, n.5.  Unlike *Engel*, however, the second eyewitness in this case, Robert Stewart, has recanted his testimony and indicated that both he and Mr. Shockley lied when they identified White and Kennell as being involved in the shooting of Freddie Chew.

10

Thus, under any objective measure, the facts in this case are even stronger than the facts the Missouri Supreme Court confronted in *Engel*.

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the court held that the materiality standard under *Brady* is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435.  The court in *Kyles* also cautioned that the materiality standard does not require the prisoner to establish that, in light of the undisclosed evidence, there would not have been enough left to convict him. *Id*. at 434-435.

At Mr. Kennell's trial, the jury did not hear any evidence to suggest that Mr. Shockley nor Mr. Stewart had any reason to falsely accuse him of the Freddie Chew murder.  (Tr. 496-558; 560-619).  Nothing could be further from the truth. Had the jury known of Mr. Shockley's tacit agreement to avoid any jail time on pending charges, the state's payment of his moving expenses, Mr. Shockley's link to a gun that could have been the murder weapon and that he lied about throwing the gun away, coupled with Mr. Stewart's recantation that both he and Shockley could not identify the perpetrators, this evidence substantially weakened the state's case and clearly undermines confidence in the verdict.  Where "the jury's estimate of the truthfulness and reliability of [the witness] may well be determinative of guilt or innocence," the suppression of *Brady* material of this nature is clearly material. *Napue*, 360 U.S. at 269.

11

## III.

## PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING ON HIS *BRADY* CLAIM

As noted earlier, this Court briefly noted in its recent order that it would deny an evidentiary hearing at this time because petitioner cannot establish his innocence under 28 U.S.C. § 2254(e)(2)(B). (Doc. 79 at p. 4). This reasoning clearly conflicts with its prior finding in Mr. White's case that there is cause to overcome any procedural bar to his *Brady* claim from his failure to raise it earlier in state court proceedings. This reasoning also fundamentally conflicts with the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 420 (2000).

The Supreme Court in *Williams* equated the text of 2254(e)(2), which limits a habeas petitioner's right to an evidentiary hearing if he "failed to develop the factual basis of the claim in state court proceedings" to the requirement under pre-AEDPA law that a habeas petitioner show cause for failing to develop a factual basis for a claim in state court under the decision in *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 8-9 (1992). *Id*. at 429-434. Thus, in a situation such as here, where petitioner's state post-conviction counsel were diligent and there is cause to overcome any procedural bar because the factual basis for the claim was concealed, the provisions of 2254(e)(2) do not limit a federal habeas petitioner's ability to obtain a hearing. *Id*. at 434-437.

12

The finding of cause to overcome the procedural default in the *White* case clearly indicates that 2254(e)(2) does not impose any impediment to this Court's grant of an evidentiary hearing. Although the current evidence is strong that a *Brady* violation has occurred, such a hearing would remove any remaining doubts in the court's mind.

The court also appears to fault petitioner for not making more of an effort to depose both Shockley and Stewart. This criticism, however, fails to take into account the diligent efforts made by petitioner's counsel and counsel for codefendant Christopher White to locate, interview, and obtain sworn statements from both Stewart and Shockley. After counsel for petitioner located Mr. Stewart in a Florida jail, he retained investigator David Haubrich to interview him and attempt to obtain an affidavit from him. As noted earlier, Mr. Stewart, at first, agreed to discuss the case with Mr. Haubrich. (Exh. 7). However, Stewart refused to sign a sworn affidavit and refused to cooperate further. (*Id.*).

During this same timeframe, Christopher White's counsel, Kevin Schriener, attempted to locate, contact, and interview Jeffrey Shockley. After locating Shockley through his attorney and parole officer, Mr. Schriener was contacted by Mr. Shockley's brother, who indicated to Mr. Schriener that Mr. Shockley did not wish to become involved in the case and would not agree to talk to him. In light of the fact that Mr. Stewart and Mr. Shockley refused to cooperate with counsel for

13

petitioner and counsel for Mr. White, an evidentiary hearing, where these witnesses can be subpoenaed and compelled to give sworn testimony, is the only reasonably available forum where these witnesses can be compelled under oath to provide testimony regarding petitioner's *Brady* claim.

It was also not feasible to depose these witnesses, even if they had been cooperative, because petitioner is indigent and the person who entered into the fee agreement with retained counsel, his former fiancée, no longer provides any financial support for petitioner's post-conviction litigation. If an evidentiary hearing is granted, petitioner's counsel will move to be appointed in this case pursuant to the Criminal Justice Act. In any event, the testimony of Mr. Shockley, all of his prior public defenders, the prosecutors, Mr. Stewart, and others will prove beyond any doubt that a *Brady* violation occurred in this case.

        Respectfully submitted,


        */s/  Kent E. Gipson*
        Kent E. Gipson, #34524
        Law Office of Kent Gipson, LLC
        121 East Gregory Boulevard
        Kansas City, Missouri 64114
        816-363-4400 • Fax: 816-363-4300
        kent.gipson@kentgipsonlaw.com

        *ATTORNEY FOR PETITIONER*

## **CERTIFICATE OF SERVICE**

    I hereby certify that on this 5th day of March, 2015, this supplemental traverse was filed via the CM/ECF system which sent notification to all counsel of record.

        /s/  *Kent E. Gipson*
        Kent E. Gipson