**18UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

JUANE T. KENNELL,      )
                               )
      Petitioner,        )
                               )
        vs.            )     No. 4:09CV00407 AGF
                               )
DAVE DORMIRE,       )
                               )
      Respondent.    )

## MEMORANDUM AND ORDER

This matter is before the Court on the amended petition of Missouri state prisoner Juane Kennell for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted of murder in the first-degree, assault in the first degree, and two counts of armed criminal action, all related to the June 21, 2002 murder of Freddie Chew and assault of Jeffrey Shockley in the same shooting incident. Petitioner was sentenced to life imprisonment without the possibility of parole, 15 years imprisonment, life imprisonment, and life imprisonment, respectively. In his amended petition, filed with the assistance of counsel, Petitioner asserts the following two grounds for federal habeas relief:

(1) The state violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963) (holding that due process requires the prosecution to disclose to the defense material impeachment evidence), and *Giglio v. United States*, 405 U.S. 150 (1972) (holding that evidence tending to impeach the credibility of a prosecution witness, such as a promise of

prosecutorial leniency in exchange for the witness's testimony, is subject to *Brady*

disclosure requirement),[1] by withholding evidence that key prosecution witnesses

Shockley and Robert Stewart received favorable treatment, or promises thereof, in

exchange for their testimony against Petitioner; and by withholding evidence that a gun

like one Shockley testified he used and then threw away at the scene was later found by

the police in a car in which Shockley was a passenger.

(2) Defense counsel was ineffective for failing to disclose Petitioner's alibi

defense to the state prior to trial; for never investigating, interviewing, or presenting the

testimony of witnesses to corroborate Petitioner's alibi defense; and for not submitting an

alibi instruction.

Respondent argues that Petitioner's *Brady* claim is barred because it was

procedurally defaulted, and alternatively, that the claim is without merit. Respondent

argues that the state court's adjudication of Petitioner's ineffective assistance of counsel

claim was legally and factually reasonable. On September 3 and 4, 2015, the Court held

an evidentiary hearing on the *Brady* claim, and new evidence, as well as post-hearing

briefs, have been submitted to the Court.[2] Upon review of the entire record and

---

[1] This Court refers to Petitioner's claim under *Brady* and *Giglio* as a "*Brady*" claim for convenience and clarity.

[2] In a footnote in his post-hearing brief, Petitioner "moves to amend his habeas petition based upon evidence revealed in subsequent discovery and the hearing, to include a claim that his conviction was secured through the knowing use of perjured testimony from Shockley and Stewart" related to an alleged arrangement for prosecutorial leniency in exchange for their testimony. (Doc. No. 148 at 2 n.1.) The Court grants this request as it does not change the essential contours of Petitioner's *Brady* claim.

assessment of the credibility of witnesses at the evidentiary hearing, habeas relief will be denied.

## **BACKGROUND**

### **Trial**

Petitioner was charged by information on December 17, 2002, with acting with others in committing the crimes of conviction. One Christopher White was similarly charged for the same crimes. Petitioner and White were tried separately, with White's trial commencing a few days after Petitioner's ended. Robert Craddick was the prosecutor in both cases. Missouri public defender Stephen Reynolds entered his appearance on Petitioner's behalf on the day Petitioner was charged. On February 27, 2003, another public defender (Afocha Ibe) entered her appearance for Petitioner. Petitioner's trial commenced on January 5, 2004. At the time of trial, Shockley had two state felony charges pending against him that had been filed on February 18, 2002, for possession of cocaine base (a class C felony), and carrying a concealed weapon (a class D felony).

There is no dispute about the sufficiency of the evidence against Petitioner. This evidence established the following. Sometime between 5:00 a.m. and 5:50 a.m. on June 21, 2002, Shockley (who was 17 years old at the time) and his friend Stewart were walking to Shockley's house after spending the night at a friend's house where they had smoked marijuana throughout the night. Shockley and Stewart stopped at the house where their friend Chew was staying (referred to herein as "Chew's house"), which was a few houses away from Shockley's house, to join Chew and his girlfriend Jacqueline

3

Daughtery on the front porch. While chatting on the porch and preparing to smoke marijuana, the friends saw a car stop at Shockley's house and three men (all in their late teens or early 20s) with large guns in their hands exit the car. Daughtery began knocking on the front door of Chew's house to get in, making a lot of noise, and the three men who had exited the car began walking towards the house. Shockley knew Petitioner and White and saw that they were two of the men approaching Chew's house. A few years prior, Shockley and Petitioner's younger brother had had a fight, and since that time, Shockley and Petitioner's brother continued to engage in violent altercations, sometimes involving guns.

As the three men approached, Daughtery, Chew, Shockley, and Stewart jumped off the porch into the gangway on the side of the house. Daughtery ran to the back door of the house and went inside. Chew and Shockley had guns too; Shockley's gun was a Glock 9mm. When the three men from the car reached Chew's house, they asked where Shockley and another individual were. Chew stepped out of the gangway and fired at the three men, whereupon the three men fired at Chew who fell to the ground. Shockley also fired at the three men, and as shooting continued, Shockley and Stewart ran from the scene, with one of the three men from the car shooting at them in pursuit.[3] The other two men from the car shot Chew at point-blank range as he tried to get up, killing him.

Police arrived at the crime scene at 5:50 a.m. and recovered approximately 50 shell casings at the scene from at least five different guns, including two casings from a

---

[3]    As to identity of this shooter, Shockley testified, "If I'm not mistaken, it was [Petitioner]." (Resp. Ex. A at 521.)

Glock 9mm. No weapons were retrieved from the scene. At the scene, Shockley and Stewart told the police that Petitioner and White were two of the shooters. Stewart testified that he recognized Petitioner from having seen him in the neighborhood two or three times in the three months prior to the shooting, with Shockley pointing Petitioner out to him, though he had never actually met Petitioner or seen his face close up before the shooting. Shockley testified that Stewart did not "know" the two named shooters before the incident, and that he (Shockley) said to the group on the porch as the three men were approaching that it was Petitioner "and them" approaching.

Shockley and Stewart told the police they did not know who the third man was, but upon further questioning by the police they named two individuals, first "Little Wimpy," and second, "Little Wheezey," who might have been the third man from the car. In addition, a few hours after the shooting, Stewart told the police he thought an individual named Corey Hughes was one of the three men. Upon investigation, the police determined that none of these individuals was the third man. The day after the shooting, Shockley and Stewart separately picked out Petitioner and White from a photo array, and a few days later, from a live lineup. Shockley testified that while he was running away from the shooters, he tossed his gun in an alley and never retrieved it.

The main prosecution witnesses at trial against Petitioner were Shockley and Stewart who each testified to the above with respect to the crimes, with the exception of the shooting of Chew as he tried to get up, which they did not witness. Another witness, who could not identify any of the shooters, testified about that aspect of the incident. Petitioner's fingerprints were recovered from the car in which the three men had arrived

at the scene.  No other physical evidence or other witnesses besides Shockley and Stewart placed Petitioner at the scene.  Neither the prosecution nor the defense asked Shockley about his pending state felony charges.

The focus of the defense was the contention that Shockley and Stewart falsely identified Petitioner for the purpose of revenge, with a secondary defense of alibi. Petitioner also requested that the jury be instructed on self-defense, and the trial court did so.

Prior to trial, defense counsel failed to provide the state with a written disclosure of Petitioner's alibi defense, as required by Missouri Supreme Court Rule 25.05.  At trial, defense counsel reserved the right to give her opening statement after the state presented its case.  When the state rested, defense counsel informed the prosecutor that she planned to call Petitioner's grandmother, Hattie Bolton, as an alibi witness.  The prosecutor objected based on defense counsel's failure to disclose Petitioner's alibi defense.  The trial court ruled that defense counsel could not discuss Bolton or the alibi defense in opening statement, and reserved ruling on the motion to exclude Bolton as a witness. (Resp. Ex. A at 625-37.)

Later in the trial, when defense counsel told the court that she intended to call Bolton as her next witness, the court asked defense counsel to summarize Bolton's anticipated testimony, outside of the hearing of the jury.  Defense counsel informed the court and the prosecutor that Bolton was expected to testify that Petitioner was at her home with her on the evening of June 20 and the morning of June 21, 2002.  Bolton was also expected to testify that she set her security alarm system that evening, and the alarm

had not gone off before Bolton woke up in the morning and saw Petitioner. The court ruled that Bolton could testify that she had never told Petitioner the code to the alarm system, but she could not testify that Petitioner did not know how to disable the alarm. After this discussion, the court denied the prosecutor's motion to exclude Bolton. *Id*. at 681-84.

Bolton testified that Petitioner was at her home during the evening of June 20 and morning of June 21, 2002; that she had set her security alarm, whose code no one else knew, at 10:00 p.m. on June 20; that Petitioner was at her home watching television with her niece (Linda Gray); and that Bolton went to bed at approximately 11:30 p.m. Bolton further testified that she woke up the next morning at approximately 6:00 a.m., that Petitioner was making her coffee at the time, and that her security alarm had not gone off before then. *Id*. at 685-89. On cross-examination, Bolton admitted that she had never come forward and told the police or the prosecutor's office that Petitioner had been at her house on June 20 or June 21, 2002. *Id.* at 695.

Petitioner testified that he was at "home with my family" on the evening of June 20 and the morning of June 21, 2002. *Id.* at 794. In rebuttal, the prosecutor called a police officer who testified that Petitioner was taken into custody on June 26, 2002, and at that time, Petitioner could not account for his whereabouts during the time of the shooting. *Id*. at 821. In closing argument, defense counsel reminded the jury that Bolton had testified that she saw Petitioner when she went to sleep and when she woke up on the dates in question and that the alarm did not go off during the evening. Defense counsel also argued that Bolton's testimony was credible. *Id.* at 861-62.

Defense counsel did not submit an alibi instruction. The jury was instructed on the elements of the charged crimes, and was told that Petitioner could only be convicted if each element was proven beyond a reasonable doubt. The verdict director required a finding that Petitioner or another person committed the crimes and that Petitioner acted together with or aided another person for the purposes of committing the crimes. The court also read a general converse instruction, and an instruction, submitted by Petitioner, that "[t]he presence of a person at or near the scene of an offense at the time it was committed is alone not sufficient to make him responsible for the offense, although his presence may be considered together with all of the evidence in determining his guilt or innocence." (Resp. Ex. B at 43-68.)

On January 9, 2004, the jury returned a verdict of guilty on all four counts. On January 12, 2004, White's trial commenced. At White's trial, defense counsel asked Shockley on cross examination about his pending state felony charges, and Shockley acknowledged them.[4] On redirect examination, the state asked Shockley whether the state had offered him any benefit in exchange for his testimony, and he responded in the negative. Also at White's trial, the prosecutor and defense counsel advised the court, out of the hearing of the jury, that the Glock 9mm that had been found in Shockley's car a few days after Chew's murder matched casings that were found at the murder scene. On

---

[4]    The Court takes judicial notice, under federal Rule of Civil Procedure 201(b)(2), of the trial transcript in White's case, though not for the truth of any matter asserted therein. *See* C. Wright and K. Graham, 21B Federal Practice & Procedure § 5106.4 (discussing the distinction between taking judicial notice of the "existence" of a statement of fact in court records and taking notice of the "truth" of that fact).

January 16, 2004, White was found guilty of the same crimes as Petitioner. On February

15, 2005, the Missouri Court of Appeals affirmed Petitioner's convictions. (Resp. Ex. E.)

**Shockley's Plea Negotiations, Guilty Plea, and Sentencing**

On July 3, 2002, the State offered Shockley a plea agreement in connection with

the February 18, 2002 state felony charges against him. In exchange for a guilty plea, the

State offered to recommend suspended execution of a two-year sentence, and placement

on probation for a period of two years, with the conditions that Shockley complete the

REACT program, perform 80 hours of community service, serve 60 days of shock

incarceration, and pay court costs. The offer did not require Shockley to testify against

anyone. (Doc. No 116 at 52.)

Sometime thereafter and before February 2003, the State presented Shockley with

a typewritten unsigned, undated plea offer that differed from the original offer in that the

State agreed to recommend a suspended imposition of sentence with no requirement for

shock incarceration, but added the requirement that Shockley would have to testify

against Petitioner and White and against Shockley's own brother, who was charged with

an unrelated crime (a vehicular homicide involving a car driven by Shockley's brother in

which Shockley was a passenger). Shockley did not accept either plea offer.

On February 9, 2004, approximately two years after the two felony charges were

brought against Shockley, and a few weeks after Petitioner and White were convicted,

Shockley entered a guilty plea to the two state felony charges against him. Shockley's

appointed counsel, Robert Taaffe, stated at the start of the plea colloquy that no plea

agreement existed. The prosecutor recommended a two-year suspended execution

sentence, two years of supervised probation, 80 hours of community service, 60 days of shock incarceration, and court costs, similar to the original plea offer. (Doc. No. 13-2 at 6.) The court ascertained that Shockley had no prior convictions or any other pending charges.

After the court accepted Shockley's plea to both charges, Taaffe argued for a more lenient sentence than that recommended by the State, as follows:

> Mr. Shockley's nineteen years old. He used to live in the City of St. Louis. Now he lives in St. Louis County with his mother. For the past two years, Mr. Shockley has cooperated with the State of Missouri in the prosecution of two murder first cases. . . . As a result of this testimony, Judge, the state secured two first degree murder convictions, and Mr. Shockley did this not just as a concerned citizen, which would be his normal duty, but did this when his life was threatened. And he cooperated with the state. They moved him. He's out of the neighborhood, Judge, he's out of that element, and he did what he ought to have or should have done as a citizen. . . . Your Honor, and he did all of this without an agreement from the State of Missouri. There was no plea agreement for Mr. Shockley to cooperate with the State of Missouri. No agreement. No quid pro quo, your Honor. He did this because he thought it was the right thing to do.

*Id*. at 12-13. Shockley's counsel asked for a suspended imposition of sentence and six months of unsupervised probation. The Court sentenced Shockley to a suspended imposition of sentence on both counts and one year of unsupervised probation, with no court costs to be paid by Shockley.

**Petitioner's State Postconviction Proceedings**

In his amended motion for state postconviction relief, filed with the assistance of appointed counsel on October 27, 2009, Petitioner claimed that defense counsel provided ineffective assistance by failing to disclose Petitioner's alibi defense, failing to investigate and present thoroughly the alibi defense, and failing to submit an alibi

instruction to the jury.[5]  Petitioner alleged that he had provided the names of five

potential alibi witnesses to defense counsel (or her predecessor), including Bolton;

Petitioner's younger sister Hadda Holmes, who was eight years old at the time of the

crimes; Petitioner's younger brother; and two other relatives, Linda Gray and Antonio

McCaster, who were all with him at home on the evening of the crimes.  Petitioner

further alleged that all five witnesses had been willing to testify on his behalf.  (Resp. Ex.

F at 31-34.)

At the hearing on the postconviction motion, Petitioner called four witnesses:

defense counsel, the office manager at the Public Defender's Office where defense

counsel worked, Bolton, and Holmes.  Defense counsel acknowledged that Petitioner

gave her the names of several potential alibi witnesses, including Bolton and others

whose names she could not remember.  Defense counsel testified that, during her first

conversation with Bolton, Bolton told her that she had been out of town at the time of the

crimes and that Petitioner "was taking care of the children."  Thus, according to counsel,

---

[5]    Petitioner also claimed that defense counsel provided ineffective assistance by failing
to call one Jerome Johnson to testify, but this claim is not raised now for federal habeas
relief.  As discussed *infra*, Petitioner asserted that Johnson would have testified that a few
days after Chew's murder, Shockley and Stewart told Johnson that they were not sure
Petitioner was one of the shooters and just assumed he was and that he was retaliating for
the shooting of his brother Jesse a few hours earlier.  Petitioner asserted that:

> Johnson'[s] identification was provided to counsel as part of discovery and
> listed him as Jerome Calvin Johnson, Jr. and his date of birth as December
> 31, 1984.  His address was provided as 4241 Harris St., St. Louis, Missouri,
> 63107.  That evidence was provided in a report documenting the July 1,
> 2002 arrest of Johnson, Shockley and Stewart during [which] a 9mm Glock
> handgun was recovered.

(Resp. Ex. F at 29-30.)

Bolton's and Petitioner's "stories didn't match." Defense counsel further testified that approximately a month before trial, Bolton told her that she remembered that she was at home with Petitioner on the dates in question. Defense counsel testified that she had little confidence in Bolton's new story. (Resp. Ex. G at 2-28.)

Although Bolton told defense counsel that Petitioner was watching children, defense counsel testified that she never attempted to interview those children. Defense counsel was not asked directly why she did not interview Holmes, but she testified that in general she did not believe that children made good witnesses. *Id.*

Defense counsel testified that the only sanction for her failure to disclose an alibi defense was the court's limitation on her opening statement, that the jury still heard the alibi defense, and that she was allowed to argue the alibi defense in her closing argument. However, defense counsel also testified (somewhat contradictorily) that she thought she could not give an alibi instruction because she failed to provide the required notice before trial. *Id.*

The office manager testified that defense counsel had been given Petitioner's case file from his previous defense attorney, and that the file included notes on the five potential alibi witnesses identified by Petitioner. (Resp. Ex. G at 30-34.)

Bolton testified at the hearing that when she first met with defense counsel, Bolton did not discuss an alibi defense or where she or Petitioner were on the evening of June 20, 2002. Then, Bolton essentially reiterated her trial testimony. Additionally, Bolton testified that she could not recall whether McCaster was at her house on June 20 or June 21. (Resp. Ex. G at 36-45.)

Holmes testified that she was at Bolton's home with Petitioner and Bolton on the evening of June 20 and the morning of June 21, 2002. On June 20, Holmes went to sleep at 9:00 p.m., and she woke up at 6:30 a.m. the next morning and Petitioner was there at that time. When questioned why she remembered that particular evening, Holmes responded that Petitioner was always at Bolton's house when she (Holmes) was there. (Resp. Ex. G at 54-69.) Petitioner did not present the testimony of any of his other potential alibi witnesses at the postconviction hearing.

In denying Petitioner's postconviction motion, the motion court found that defense counsel was negligent in failing to give proper notice of alibi to the state, but that this was not an error of constitutional magnitude, as the only sanction imposed was a limitation on opening statement and there was no constitutional requirement that defense counsel make an opening statement. In any event, there was no prejudice because alibi evidence was presented and argued, and defense counsel's decision not to seek an alibi instruction was a matter of trial strategy. (Resp. Ex. F at 40-42.)

The state motion court found that the hearing testimony of Bolton and Holmes was not credible and that Holmes's testimony would have had no effect on the outcome of the jury, and concluded that defense counsel's failure to interview and present Holmes as a witness was "within the wide range of reasonable professional assistance." The court explained that defense counsel knew or should have known of Holmes's identity and that although counsel testified to no specific reason for omitting Holmes, it was "inferable that she preferred to concentrate on adult witnesses." The court held that in any event, Petitioner failed to show prejudice, as Holmes's testimony at the postconviction hearing

was not credible, and she added nothing to the testimony of Bolton. Furthermore, like Bolton, Holmes could not testify that "in fact [Petitioner] was with them on the night of the murder." *Id.* at 42.

The Missouri Court of Appeals summarily affirmed the denial of postconviction relief. (Resp. Ex. J.)

**Federal Habeas Action**

In his amended federal habeas petition filed on September 17, 2009, Petitioner asserted that the state violated his rights under *Brady* by withholding evidence that Shockley and Stewart received favorable treatment, or promises thereof, in exchange for their testimony against Petitioner. Referencing Shockley's February 18, 2002 state felony charges, Petitioner argued as follows:

> The record clearly indicates [a deal existed between the state and Shockley] and the state was required by *Brady* to disclose to the defense that Shockley was facing two felony charges and was testifying with an expectation of receiving leniency on those charges from the state. The existence of this secret deal is corroborated by the circumstances surrounding the disposition of Shockley's case, which is the only explanation for why the case languished on a docket for nearly two years before petitioner received an extremely lenient plea bargain for probation just weeks after he testified against petitioner.

(Doc. No. 13 at 9.)

As exhibits to his amended petition, Petitioner submitted (1) a copy of Shockley's February 9, 2004 guilty plea and sentencing hearing; and (2) evidence (Doc. No. 13-2 at 16-29) that on July 1, 2002, ten days after Chew's murder, a car driven by Shockley, in which Stewart was in the back seat, and an individual named Jerome Johnson was in the front passenger seat, was stopped by police for a traffic violation. A Glock 9mm was

retrieved from under the front passenger seat and Johnson was charged with possession of a concealed weapon. Shockley was arrested for possession of a baggie of marijuana found in his pants pocket, and Stewart was arrested for possession of a baggie of marijuana and a small baggie containing one rock of crack cocaine found under the back seat of the vehicle, within Stewart's access. Shockley was 17 years old at the time, and had no prior criminal convictions. Ballistics testing by the police on July 2, 2002, revealed that the Glock 9mm was one of the firearms that was involved in the June 21, 2002 shooting.

Petitioner alleged that the prosecutor never disclosed the July 1, 2002 charges against Shockley and Stewart, and that "there is strong reason to believe, as subsequent discovery will verify, that both Stewart and Shockley were also given favorable consideration on those charges in exchange for their cooperation and testimony against petitioner and . . . White." (Doc. No. 13 at 3.) In his affidavit dated February 22, 2010, filed in support of his amended petition, Petitioner stated that prior to his trial, he had "no evidence that either Mr. Shockley or Mr. Stewart had been arrested for any crimes or been charge [sic] with any crimes." He further attested that he did not learn of any such information until he "received additional police reports and other documents mailed to [him] January 2009" from White. (Doc. No. 28 at 2.)

With respect to his claim that defense counsel was ineffective for failing to adequately investigate and present an alibi defense, Petitioner posits three ways defense counsel was ineffective. First, defense counsel failed to provide the prosecutor notice of the alibi defense and was therefore not allowed to mention it in opening statement.

Second, defense counsel did not submit an alibi instruction, and testified that she believed she could not submit an alibi instruction because she had failed to file the notice. Third, Petitioner claims that defense counsel should have interviewed and presented the testimony of Holmes and the other identified alibi witnesses to the jury to corroborate his alibi defense. *Id.* In his traverse, Petitioner focuses solely on Holmes, and does not mention the other alibi witnesses.

In response to the amended petition, Respondent argued that the *Brady* claim was procedurally defaulted because it was never presented to the state courts, and Petitioner cannot establish cause and prejudice to excuse the default. Respondent argued that, in any event, the claim fails because the existence of a deal with either Shockley or Stewart was mere speculation, especially with regard to Shockley, in light of defense counsel's assertion at Shockley's guilty plea hearing that there was no deal.

Respondent argued that this Court should reject Petitioner's ineffective assistance of counsel claim for the same reasons as did the Missouri courts: the lack of notice did not create constitutional prejudice, and defense counsel's strategic choices not to call Holmes and not to submit an alibi instruction were reasonable and not prejudicial. Respondent also argued that a separate alibi instruction was not needed because the verdict director required Petitioner's presence at the scene of the crime. (Doc. No. 20 at 6-7.)

By traverse, Petitioner asserted that the factual predicate for his *Brady* claim with respect to a deal with Shockley related to his February 18, 2002 felony charges was not discovered until January 2009, when, according to Petitioner's affidavit, White sent

Petitioner several documents in the mail. Included among these documents was an internal Public Defender form entitled "Conflict Transfer Request Form," dated February 7, 2003 (approximately 11 months before Petitioner's trial), that Petitioner attached to his traverse. The document stated as follows:

> Bob Taaffe represents Jeff Shockley in 021-0715. SR has just learned that Bob negotiated a deal for Jeff Shockley to testify against [Petitioner], who was just arraigned on 1/13/03, as well as possibly another defendant, Christopher White (who may also be coming down the pike, as I think we just interviewed that guy today).

(Doc. No. 28 at 6.) Petitioner stated that White turned over these documents to Petitioner, and that Petitioner's counsel, after investigation, "was able to uncover additional evidence of a secret deal with Shockley, as demonstrated by the plea transcript . . . ." (Doc. No. 27 at 8.) Petitioner also asserted that the state never disclosed that it gave Shockley financial assistance to relocate him prior to his testimony in Petitioner's case, as revealed in the guilty plea transcript.

Petitioner maintained that the state's failure to turn over during discovery information about the purported deals with Shockley and Stewart established cause for his failure to raise his *Brady* claim to the state courts. He asserted that the prejudice requirement to overcome the procedural bar is identical to the *Brady* requirement to show materiality by showing "a reasonable probability of a different result" and that this test is met here.

The Court granted Petitioner's request to engage in discovery to ascertain whether Stewart and/or Shockley had negotiated favorable treatment in exchange for their testimony against Petitioner. After various offices asserted objections to producing case

files, the Court ordered the Circuit Attorney's Office for the City of St. Louis, the St. Louis Metropolitan Police Department, and the Missouri Public Defender System to provide numerous files for the Court's *in camera* inspection, including any files involving charges filed against Shockley and Stewart.

Meanwhile, Petitioner supplemented the record with three exhibits related to his *Brady* claim: The first exhibit is an affidavit dated October 9, 2012, by David Haubrich, an investigator hired by Petitioner to interview Stewart. Haubrich attests that he interviewed Stewart on August 2, 2012, and that Stewart told him that he (Stewart) was not offered any deal to testify against Petitioner and White. Rather, the judge in his case offered to drop the charges if he would enlist in the army, which Stewart did. Haubrich further states that Stewart told him that he did not get a good look at the shooters and that when the police showed him the photo array, he had trouble picking out the shooters; that the police then gave him a break at the same time Shockley was on a break and that at that point Shockley "coached" him, describing Petitioner as having darker skin and White having lighter skin, and that after that, he (Stewart) was able to choose the photos that best fit Shockley's description. Haubrich goes on to attest that Stewart said he never heard Shockley say he was offered "some kind of a deal, but it was obvious, because he never went to prison on his serious [felony] charges" and "there was something going on between the police and Shockley." Haubrich ended by attesting that he tried numerous times to obtain a sworn statement from Stewart, but that Stewart refused. (Doc. No. 77 at 6-8.)

The second supplemental exhibit submitted by Petitioner is a copy of the typewritten undated, unsigned plea agreement offered to Shockley by the state, noted above, which the state provided to Petitioner and White prior to the Court's *in camera* review of the documents. And the third supplemental exhibit is a declaration by Johnson dated October 24, 2012, in which Johnson stated that Shockley and Stewart told him they could not recognize the men who shot Chew because the shooters were wearing ski masks, and that they (Shockley and Stewart) just guessed as to who the shooters were. Johnson also stated that the gun found by the police in the car he was driving in with Shokley and Stewart on July 1, 2002, was not his, and he did not know it was under his seat. *Id*. at 15-17.

The Court reviewed the *in camera* documents and found little to support Petitioner's assertions of any deal with respect to the July 1, 2002 arrests. The *in camera* documents show that within days of Shockley's and Stewart's July 1, 2002 arrest for possession of a baggie of marijuana/one rock of cocaine (and no later than July 5, 2002), those charges were refused for lack of "sufficient value" with respect to Shockley and for "insufficient connection" with respect to Stewart.[6]

The Circuit Attorney's files did not reflect any plea agreement with Shockley regarding his February 18, 2002 charges other than the unsigned plea agreement that had been produced. Included in the *in camera* documents from the Missouri Public Defender's Office are Taaffe's "Working Notes" documenting his representation of Shockley from August 26, 2002, through February 9, 2004, on the two state felony

---

[6] This document was provided to Petitioner pursuant to his discovery request.

charges.  Shockley has since waived his privilege with respect to these documents and they were disclosed to Petitioner.   The notes reflect ongoing discussions that Taaffe had with Shockley and the state, some of which involved discussions of a potential deal in exchange for Shockley pleading guilty.  According to the notes through January 2002, the first "sticking point" was that Shockley, who at that time was willing to testify against his brother, Petitioner, and White, would not accept a deal that included 60 days shock in jail.  Notes from February 6 and 7, 2003, state that Shockley would want immunity for his involvement in the Chew shootings, but that the state was not willing to grant immunity.  On February 20, 2003, Taaffe told Craddick that Shockley did not want to testify against his brother, and Craddick told Taaffe that the state already had a video statement (although it is unclear, the video statement referred to may have been by Shockley against his brother).  On March 17, 2003, Shockley told Taaffe that he did not want to testify against anyone, and so Taaffe advised him that his options would be to plead blind or go to trial.  An entry dated November 13, 2003, stated as follows:

> Met with Jeff [Shockley] and Robert Craddick over the last.  Jeff agreed to testify in trials against Christopher White and [Petitioner].  The State hinted that there may be a nolle after this is over.  Got J. Mason to sit on the case and set it for plea the day of the trials.

The entry from February 9, 2004, stated, "Jeff plead guilty blind.  Received SIS, 1 year to report."  (Doc. No. 116 at 50-51.)

## Federal Habeas Evidentiary Hearing

Petitioner and White urged the Court to hold an evidentiary hearing, at which, Petitioner asserted, the testimony of Shockley, his attorney, the prosecutor, "and others

will remove any doubt that a tacit agreement existed" between Shockley and the state for his testimony against Petitioner. In order to allow Petitioner the opportunity to develop his *Brady* claim as fully as possible, the Court granted the request for an evidentiary hearing. At their request, a joint evidentiary hearing was held on both Petitioner's and White's habeas petitions. Nine witnesses testified at the September 2015 hearing: Reynolds (the public defender who represented Petitioner prior to trial), Shockley, Stewart, Johnson, Taaffe, Petitioner, White, Daryl Smallwood (an inmate who knew Shockley and White in jail/ prison in 2007 or 2008), and Craddick.

Reynolds testified that he was "relatively confident" that he was the "SR" referenced on the February 7, 2003 Conflict Transfer Request Form, and similarly confident that he was the author of the form. He had no independent recollection of the form or of speaking with Taaffe about anything noted therein, but testified that Taaffe might have told him that he (Taaffe) was "trying to negotiate a plea agreement" for Shockley. (Doc. No. 123 at 33, 36, 39.) Petitioner did not ask Reynolds any questions regarding the discovery disclosed to him by the state prior to trial.

Shockley testified that he was not promised anything in exchange for his testimony against Petitioner and White, and that Chew was like a brother to him and he testified against Petitioner and White for that reason. Shockley testified that in July 2002, about a month after Chew's murder, he was in danger in his apartment due to being a witness in the case and the police moved him to a hotel for two to four weeks and covered his expenses there. Shockley admitted that he lied at Petitioner's trial when he said he had disposed of the Glock that he had fired the night of the shooting, and admitted

that the Glock that was found in the car when he was stopped on July 1, 2002, with Johnson and Stewart, was the same weapon he fired the night of the shooting. He added that when his car was stopped, he did not "have [the gun] at the time." *Id*. at 51.

Shockley testified that the men who shot at Chew and the others were not wearing ski masks, as referenced in Johnson's affidavit, and that when he saw their faces he recognized them because he knew them from before. Shockley denied that he had coached Stewart with respect to identifying the men who shot Chew, and denied that he had told Johnson he (Shockley) could not identify the shooters. He also denied that he had given a copy of the Conflict Transfer Request Form to anyone. He testified that he had agreed to testify against his brother because his brother asked him to so that he (Shockley) could stay out of jail for the vehicular homicide. In the end, his brother pled guilty to the homicide charge.

Shockley testified that he was not promised anything in exchange for his testimony against Petitioner and White, and that he had no expectation that he was going to get any other favor from the state as a result of his testimony. He testified that when he pled guilty to his state felony charges he thought he might go to jail, and planned to throw himself on the mercy of the plea court.

Johnson testified that he did not know the Glock 9mm was in the car under his seat when he was arrested in July 2002, and that he was angry with Shockley and Stewart for not "taking the rap" for possession of the gun. He testified that about a week after his July 1, 2002 arrest, a local newspaper ran a front page story that the Glock 9 found in the car was linked to Chew's murder. Johnson also stated that after the Chew shooting,

Shockley and Stewart told him that they could not identify the shooters because the shooters had ski masks on.

Stewart testified that he was able to identify Petitioner and White as two of the shooters because he had seen them in the neighborhood on several occasions beforehand and recognized them. He stated that he testified at their trials because his friend (Chew) had been brutally murdered and he wanted to see justice done. He stated that no one ever made a deal with him in exchange for his testimony and that Shockley did not coach him with the identifications. He admitted that he spoke with Haubrich for approximately 30 to 45 minutes, but denied ever telling Haubrich that it was too dark for him to clearly see the faces or identities of the shooters, or that Shockley coached him. He said it was evident that Haubrich was asking leading questions designed to affect the outcome of the case. Stewart testified that he believed he was not prosecuted in connection with the July 2002 arrest because the judge wanted to allow him to get his GED and do his army service.

Taaffe testified that although he attempted to negotiate a plea deal for Shockley, no formal or tacit agreement was ever reached. Taaffe testified that once Shockley agreed to testify against Petitioner and White, Taaffe tried to get the state to agree to dismiss the pending felony charges against Shockley, but that ultimately Shockley pleaded "open" and the only reason for that would have been that negotiations with the state had broken down. With respect to the Conflict Transfer Request Form, Taaffe testified that if the state made an offer to one of his clients to testify against another individual represented by the Public Defender's Office, he would have reported a conflict

of interest to the appropriate person. Taaffe testified that according to his notes, at about the time the Conflict Transfer Request Form was dated (February 7, 2003), the state had made an offer to Shockley, but Shockley declined the offer because it did not grant him immunity. In addition, the offer required Shockley to testify against his brother in another criminal matter, and Shockley did not want to do that. Taaffe believed that Shockley wanted to testify against Petitioner and White because they had killed his friend. Taaffe also explained that he intentionally continued the felony case against Shockley until Petitioner's and White's trials were over, thinking Shockley would get some sentencing benefit from having testified for the state in those cases, and that he (Taaffe) would have communicated this to Shockley, even though there was no deal with the state.

When asked by the state about his Working Note from November 13, 2003, that stated that that the state "hinted at a potential nolle," Taaffe indicated that when Shockley agreed to testify for the state against Petitioner, "it was clear . . . that he was not going to get anything worse than probation and [Taaffe] had hoped [he] could talk the State into dismissing the charges after [Shockley] testified." Taaffe explained that the original recommendation was for probation anyway and that there was "nothing in the [November 13, 2003] note to indicate that Craddick made a promise that [Shockley] wasn't going to go to jail," and in fact, no such promise was made. Nevertheless, Taaffe then stated that Craddick was the one who "hinted at a nolle." (Doc. No. 123 at 132-33.) On cross examination, Taaffe testified unequivocally that there was no "secret deal" with the state in exchange for Shockley's testimony, and that he would have told Shockley at the time

he took the stand against Petitioner that "we were hoping to get a better deal from the State with his cooperation and/or hoping to get a better disposition from the Court if he testified on behalf of the State." *Id*. at 135-36.

Petitioner testified that in January 2009, White mailed him a copy of the Conflict Transfer Request Form described above, stating that he got it from Smallwood. He testified that White sent him other documents from Smallwood disclosing to Petitioner, for the first time, that Shockley and Stewart had been arrested previously, and that the Glock 9mm used in the shooting was in the car. On cross-examination, however, Petitioner acknowledged that on July 27, 2003, he wrote a letter to his defense counsel (Ibe) telling her that he was informed that on July 2, 2002, Johnson had been arrested "with a murder weapon used at the scene" of Chew's murder, and that Shockley and Stewart were with Johnson. In an attempt to explain the apparent inconsistency between this letter and his February 22, 2010 affidavit in which he attested that prior to his trial, he had "no evidence" that either Shockley or Stewart had been arrested for any crimes, Petitioner testified that when he wrote the letter to Ibe, he "hadn't had actual information" about the July 2, 2002 arrests, just that "it was rumored that Johnson had been arrested for it." He testified that defense counsel never followed up on this information. (Id. at 154-62.)

White testified that in 2007 or 2008, Smallwood gave him a copy of the Conflict Transfer Request Form and White then sent it to Petitioner. Smallwood testified that in 2007 or 2008, he was incarcerated in the same jail as Shockley, and Shockley gave him the Conflict Transfer Request Form and asked him to give it to White, which he did.

25

Smallwood testified that Shockley told him he did not "see anything" at the shooting and had lied at Petitioner's and White's trial to get a deal. Shockley was recalled as a witness and denied giving Smallwood the Conflict Transfer Request Form.

Craddick testified that he did not have a specific memory of conversations with Taaffe regarding a deal for Shockley, but definitively stated that he (Craddick) never offered to dismiss the charges against Shockley, or hinted that he would. He testified that Shockley told him that he would testify against Petitioner and White because his best friend had been killed, and so he (Craddick) was not concerned that Shockley would refuse to testify unless the state gave him something in exchange. Craddick explained further that in light of Shockley's age and lack of a criminal record, Shockley was likely to receive supervised probation, which was what Craddick would have offered him anyway, and so Craddick had no motivation to offer Shockley a deal because it would have only negatively impacted Shockley's credibility. *Id*. at 232-33. Craddick did not recall whether Shockley was put up in a hotel before Petitioner's and White's trials, but he explained that it was the prosecutor's office's practice to do so when a witness did not feel safe. Craddick testified that if, when he was prosecuting Petitioner's and White's cases, he had the lab report on the Glock 9 found in Shockley's car on July 1, 2002, he would have turned the report over to defense counsel in both Petitioner's and White's cases.

**Post-Hearing Evidence**

Documents from the St. Louis City Circuit Attorney's Office indicate that the Victim's Services Unit paid for Shockley to stay at a hotel from July 28, 2002, until

August 5, 2002, and in October 2002, paid a little over $1,000 for Shockley and his mother to relocate to an apartment in another neighborhood. Shockley's probation files were also provided to Petitioner after the hearing. They show that Shockley was placed under the supervision of the Missouri Board of Probation and Parole, and although field violation reports were filed by his probation officer, the plea court did not revoke Shockley's probation, which he completed on February 9, 2005.

## Post-Hearing Arguments of the Parties

The parties submitted simultaneous post-hearing briefs. Petitioner argues that the testimony of Taaffe and Craddick, and Taaffe's Working Notes, establish that Shockley had a "tacit agreement" that in exchange for his testimony against Petitioner and White, Shockley would, at worst, get probation, and at best, get his two pending felony charges dismissed. Petitioner argues that Shockley's testimony at the evidentiary hearing that he had no understanding with the state was not credible. Petitioner also maintains that the payments to Shockley for a hotel room, personal expenses, and a new apartment prior to his testimony constituted *Brady* impeachment material. According to Petitioner, Shockley's agreement to become a state's witness against his brother was further exculpatory evidence and should have been disclosed, because it showed Shockley's willingness to testify for the state in order to advance his own interests. Petitioner argues that it is clear that Stewart lied at the hearing when he denied telling Haubrich that he could not identify the shooters, as "it is incredible to believe that a licensed private investigator would commit perjury in an affidavit." (Doc. No. 148 at 12.) Petitioner argues that habeas relief should be granted as Shockley's and Stewart's credibility at trial

"was already suspect, even without considering the multiple *Brady* violations, due to their drug use, prior inconsistent statements, and the fact that they had positively identified three other perpetrators of the murder who were subsequently cleared by police." *Id*. at 17.

Respondent points to the habeas hearing testimony of Shockley, Taaffe, and Craddick as establishing that Shockley had no understanding with the state in exchange for his testimony against Petitioner and White. Respondent also argues that the guilty plea proceedings refute Petitioner's speculation that a tacit agreement existed. Respondent reasons that if the state "had in fact promised favorable treatment in exchange for Shockley's testimony, evidence of this agreement would have occurred at the plea so that the court could impose sentence accordingly, but it did not. Instead, the State went back to its original recommendation, offering no leniency in exchange for Shockley's testimony." (Doc. No. 150 at 15.) Respondent asserts that there was no need for the state to disclose the July 2002 and October 2002 payments to Shockley, and that in any event, Petitioner has failed to show that he was prejudiced by the nondisclosures relied upon for his *Brady* claim.

## DISCUSSION

### *Brady* Claim

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. As noted above, in *Giglio*, 405 U.S. at 153-54, the

Supreme Court clarified that the rule stated in *Brady* applies to evidence undermining witness credibility, such as leniency promises. Evidence qualifies as "material" when there is "'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, No. 14-10008, 2016 WL 854158, at *3 (U.S. Mar. 7, 2016) (quoting *Giglio*, 405 U.S. at 154). To prevail on his *Brady* claim, Petitioner need not show that he "more likely than not" would have been acquitted had the new evidence been admitted; he must show only that the new evidence is sufficient to "undermine confidence" in the verdict. *See id.* (quoting *Smith v. Cain*, 132 S. Ct. 627, 629-31 (2012)).

Both express agreements between the prosecution and cooperating witnesses, as well as "less formal, unwritten or tacit agreement[s]" are "subject to *Brady*'s disclosure mandate." *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) (en banc) (citing *Giglio*, 405 U.S. at 154-55). Recently, in *Wearry*, 2016 WL 854158, at *4, the Supreme Court held that the fact that the police had told a witness for the state who was seeking a deal to reduce his existing sentence that they would "talk to the D.A. if he told the truth" was subject to *Brady*'s disclosure requirement.

> These rules are designed to protect a defendant's fundamental right to fairness under the Due Process Clause of the Fifth Amendment, for when the fate of the accused turns on the credibility of a witness, the prosecutor's failure to disclose a potential motive for bias or untruthfulness may result in grave injustice.

*United States v. Rushing*, 388 F.3d 1153, 1158 (8th Cir. 2004).

In determining whether the suppression of impeachment evidence is sufficiently prejudicial to rise to the level of a *Brady* violation, a court must analyze the totality of the undisclosed evidence "in the context of the entire record." *United States v. Agurs*, 427

U.S. 97, 112 (1976). The cumulative effect of all suppressed evidence favorable to the defendant is considered, rather than considering each item of evidence individually. *Wearry*, 2116 WL 854158, at *4 (concluding that the cumulative effect of several *Brady* nondisclosures in a case in which the state's evidence "resemble[d] a house of cards," entitled the petitioner to a new trial).

Here, Petitioner's *Brady* claim has several aspects. It involves the alleged nondisclosure of two purported pieces of impeachment evidence: (1) an agreement by the state with Stewart and/or Shockley related to their July 1, 2002 arrests, in exchange for their testimony against Petitioner; and (2) an agreement with Shockley related to his February 18, 2002 felony charges in exchange for his testimony against Petitioner and White. The claim also posits the alleged nondisclosure of facts established by the record: the finding by the police of the Glock 9mm on July 1, 2002, in the car Shockley was driving, certain payments the state made related to Shockley's lodging, and Shockley's possible agreement to testify against his brother in the vehicular homicide case. It is not entirely clear whether Petitioner also continues to assert that the state did not disclose the existence of the arrests in 2002.

## Procedural Default

As noted above, Respondent raises the doctrine of procedural default to defeat Petitioner's *Brady* claim. Under this doctrine, a federal habeas court is barred from considering the merits of a claim not fairly presented to the state courts, absent a showing by Petitioner of cause for the default and prejudice resulting therefrom. *See, e.g., Wemark v. Iowa*, 322 F.3d 1018, 1020-21 (8th Cir. 2003). Here, if there is indeed a

*Brady* violation, the Court believes cause might be shown by the state's alleged failure to disclose *Brady* material. *See Banks v. Dretke*, 540 U.S. 668, 693-98 (2004). The matter is not free from doubt, as certain aspects of Petitioner's claim of a tacit deal with Shockley were known, or could have been known, to Petitioner when he sought state postconviction relief, namely, that two years had elapsed between the felony charges against Shockley and his guilty plea that was entered soon after Petitioner's trial, and that Shockley received a lenient sentence and had been moved from his residence. But the Court accepts, for purposes of this case, Petitioner's position that until he saw the Conflict Transfer Request Form he had no concrete reason to investigate facts related to any agreement in exchange for Shockley's testimony.

Whether prejudice has been shown from a suppression of evidence entails the same inquiry as does an evaluation of the merits of the claim. *See id.* at 699. In addition, because the record on the *Brady* claim has been so fully developed, the Court will exercise its discretion to address the merits of the claim rather than engage in a procedural default analysis. *See, e.g., Nance v. Norris*, 392 F.3d 284, 291 (8th Cir. 2004) (a court may by-pass a procedural default question and proceed to the merits of a habeas claim).

## Merits

The Court first concludes from a review of the evidence, and after having an opportunity to observe the demeanor of the witnesses at the habeas hearing, that Petitioner has not shown the existence of an agreement with Stewart and/or Shockley related to their July 1, 2002 arrests, in exchange for their testimony against Petitioner. As

noted above, the police report related to those arrests shows that Shockley had been arrested for possession of a baggie of marijuana in his pants pocket, and Stewart was arrested for a baggie of marijuana and a baggie containing one rock of crack cocaine found under the car seat. Shockley was 17 years old at the time, and had no prior criminal convictions. Also as noted above, the *in camera* files show that within days of the arrest (and no later than July 5, 2002), those charges were refused for lack of "sufficient value" with respect to Shockley and for "insufficient connection" with respect to Stewart. The basis for that refusal is supported by the arrest report. Petitioner presents no evidence suggesting a refusal of charges for possession of a small amount of drugs by teenagers was unusual, and offers nothing other than supposition to show that the refusal to prosecute was in any way related to the charges against Petitioner.

Petitioner's main *Brady* argument is that a tacit agreement existed between the state and Shockley related to his February 18, 2002 felony charges. The Court concludes that the record, including the testimony at the evidentiary hearing, negates the existence of such an agreement. It is clear that no written or oral agreement was ever entered into, despite the notation in the February 7, 2003 Conflict Transfer Request Form that Taaffe "negotiated a deal for Jeff Shockley to testify against [Petitioner]." The Court credits the testimony of Reynolds and Taaffe that this notation may well have meant that Taaffe and the state were attempting to negotiate a deal for Shockley. The Court concludes that no agreement was ever reached. "*Giglio* does not require disclosure of rejected plea offers; the duty to disclose is dependent upon the existence of an agreement between the witness

32

and the government." *Rushing*, 388 F.3d at 1158 (citing *Collier v. Davis*, 301 F.3d 843, 849-50 (7th Cir. 2002).

The evidence of a tacit agreement is the November 13, 2003 Working Note by Taaffe that Shockley agreed to testify against Petitioner and White and the state "hinted that there may be a nolle after this is over." But this note's probative value is weak in light of Taaffe's contemporaneous statements to the plea court that there was no "quid pro quo" for Shockley's testimony against Petitioner and White. The existence of a tacit agreement is further refuted by the consistent testimony at the habeas hearing of Shockley and Chaddick, whose testimony the Court finds credible on this question. Each testified that no tacit agreement existed. Both Taaffe and Craddick testified that Shockley was likely to get probation anyway, in light of his young age and lack of a criminal history, and their testimony was not controverted.[7] Indeed, the state did not "nolle" the felony charges against Shockley after he testified against Petitioner and White, and Taaffe made no mention of any such agreement at sentencing, further undermining the notion that the state had hinted it would or might do so in exchange for Shockley's testimony. To the contrary, the state made no mention of Shockley's trial testimony and recommended essentially the sentence it had originally offered that did not require Shockley's testimony against anyone.

---

[7] Petitioner also contends that there must have been a secret agreement because "the court took the extraordinary step of waiving Shockley's court costs, drug testing and every other normal requirement of probation." (Doc. No. 13 at 3.) Taaffe's uncontroverted testimony at the hearing, however, was that the sentencing judge waived costs and other requirements on his own, without any request from counsel.

Taaffe's testimony at the habeas hearing, when confronted with his Working Notes, did not establish that Chaddick had hinted that the state might dismiss the felony charges against Petitioner if he testified against Petitioner and White. Rather, the credible graveman of Taaffe's testimony was that he and Shockley hoped that his testimony would help with the sentencing on the felony charges, and that Shockley's motive for testifying against Petitioner was because Petitioner had murdered Shockley's best friend. The Court credits Shockley's testimony that this is why he testified against Petitioner. Shockley's (and Taaffe's) hopes that Shockley's sentencing judge might view Shockley's cooperation with the state favorably does not implicate *Brady*. *See Bell*, 512 F.3d at 233; *Wisehart v. Davis*, 408 F.3d 321, 325 (7th Cir. 2005).

The Court next concludes that even if the jury heard that the state "hinted" to Shockley that it might dismiss his felony charges if he testified against Petitioner, there is no reasonable likelihood this information could have affected the judgment of the jury. As discussed below, this was not a case in which the state's evidence was like "a house of cards," but rather a case in which the evidence of guilt was strong. Most importantly, Stewart also identified Petitioner and White as two of the shooters. *See Sullivan v. Lockhart*, 958 F.2d 823, 825-26 (8th Cir. 1992) (holding that evidence of an alleged deal the state made with a witness to drop charges against her in exchange for her testimony was not material under *Brady* where other witnesses testified to the same effect as the witness in question).

The Court further finds, based on a careful review of the entire record, and contrary to Petitioner's assertions in his affidavit, that there was no failure by the State

timely to disclose Shockley's February 18, 2002 arrest, the July 1, 2002 arrests of

Shockley and Stewart, or the fact that the firearm seized on July 1, 2002, was identified

as having been used at the scene of Chew's murder.  This finding is based on (1)

Petitioner's own assertion in his state postconviction proceedings that Johnson's contact

information was provided *as part of discovery* "in a report documenting the July 1, 2002

arrest of Johnson, Shockley and Stewart during [which] a 9mm Glock handgun was

recovered"; and (2) Craddick's hearing testimony, which the Court finds credible, that

discovery provided to White would have been provided to Kennell as well, together with

the fact that White's trial counsel had been advised of Shockley's pending charges from

his February 2002 arrest, Shockley and Stewart's July 1, 2002 arrest, and the identity of

the Glock 9mm found in Shockley's car.

Having had an opportunity to observe Petitioner's demeanor and assess his

credibility, and further finding that Petitioner's affidavit and hearing testimony are

refuted by the record, the Court does not find credible Petitioner's claim that he did not

know about the arrests and the seizure of the Glock 9mm until Smallwood provided the

information and reports in January 2009.  Tellingly, Petitioner did not offer any

affidavits or testimony by either of his trial counsel suggesting that this information was

not provided as part of the State's discovery.[8]

---

[8]    One affidavit submitted in support of Petitioner's claim stated that in conversations
with Scott Thompson and Melinda Pendergraph, the public defenders who represented
Petitioner on his direct appeal and state postconviction appeal, they "indicated that they
had no idea that either Shockley or Stewart had been arrested or charged with any offense
prior to their testimony at Kennell's trial."  (Doc. No. 28 at 5.)  However, this too is
refuted by the record, as Pendergraph specifically discussed the arrest of Johnson,

In any event, any Brady claim based on the state's alleged nondisclosure of the February 18, 2002 felony charges pending against Shockley at the time of Petitioner's trial and the arrests of Shockley and Stewart in July 2002, is without merit. The only impeachment value of that information would have been to allow Petitioner to question Shockley about a deal (or hint of a deal) with the state, *see, e.g., United States v. Morton*, 412 F.3d 901, 906 (8th Cir. 2005), and this Court concludes there was no such express or tacit deal.[9]

The Court accords little weight to Haubrich's hearsay affidavit that was not subject to cross examination. Further the Court finds that Stewart's hearing testimony regarding his identification of Petitioner was credible. The Court did not find Johnson's

_____

Shockley, and Stewart, and the recovery of the firearm used at the shooting, in the postconviction appellate brief she prepared on behalf of Plaintiff. (Resp. Ex. H at 36.)

[9]     Similarly, with respect to the Glock 9mm, Johnson's hearing testimony that a local newspaper reported this fact soon after the gun was found was not refuted, and the letter he wrote his defense counsel before trial alerted her to this supposedly non-disclosed evidence. "The government does not suppress evidence in violation of Brady by failing to disclose evidence to which the defendant had access through other channels." *United States v. Coplen*, 565 F.3d 1094, 1097 (8th Cir. 2009). Moreover, the evidence about the Glock 9mm would have gone to Shockley's credibility as it would have shown that a piece of his trial testimony, namely, that he threw his gun away at the scene of the crimes and never retrieved it, was untrue. But this aspect of his testimony was quite tangential to his testimony as a whole related to the identity of Petitioner as one of the three shooters, and there was other evidence of Shockley's lack of credibility – the jury heard about his drug use, especially throughout the night before the shooting, his possession of a gun, and his motive to incriminate Petitioner. *See Dye*, 208 F.3d at 667 (considering other evidence of a witnesses' lack of credibility in ruling on a Brady claim involving undisclosed impeachment evidence).

testimony at the evidentiary hearing that Stewart told him the shooters were wearing ski masks such that he could not identify them, to be credible, based on Johnson's demeanor, his own motivations, and the evidence as a whole, including that no other witnesses to the crimes said the shooters were wearing ski masks.  And, as noted above, there is no evidence of any *Brady* violation or plea agreement with respect to Stewart.

With respect to the state covering the cost of Shockley's hotel for eight days, as well as the financial help in relocating Shockley and his mother to another apartment at a time when he was possibly in danger in connection with the crimes at issue, the Court assumes that this was *Brady* material that should have been disclosed.  *See United States v. Librach*, 520 F.2d 550 (8th Cir. 1975) (holding that the government had a *Brady* obligation to disclose that its witness was being held in protective custody, received immunity, and was paid almost $1,000 a month for a total of approximately $10,000 for subsistence).  But the Court concludes that the nondisclosure does not undermine confidence in the verdict.[10]  Lastly, the Court fails to see any impeachment value in the fact that at some point Shockley was willing to testify, and may have given a statement, against his brother in connection with an unrelated case, as there is no indication that Shockley ever did so in return for any benefit from the state.

In light of Shockley's and Stewart's out-of-court identifications of Petitioner, their consistent versions of the crimes, the corroboration of their versions (other than the identity of the shooters) by other eyewitnesses and by physical evidence, including the

---

[10]     Indeed, such testimony could have invited either testimony or speculation by the jury that Shockley had been threatened.

evidence of Petitioner's fingerprints on the car driven to the shooting, the Court does not

believe that it can be said that the verdict in this case was of "questionable validity" or

that the state's case was built on a "house of cards."  In sum, considering the entire

record, and the cumulative effect of any and all nondisclosures, Petitioner's *Brady* claim

fails.

## Assistance of Defense Counsel

Where a claim has been adjudicated on the merits in state court, the Antiterrorism

and Effective Death Penalty Act ("AEDPA") provides that application for a writ of

habeas corpus cannot be granted unless the state court's adjudication

1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

The "contrary to" clause is satisfied if a state court has arrived at a conclusion

opposite to that reached by the Supreme Court on a question of law, or confronts facts

that are materially indistinguishable from a relevant Supreme Court precedent but arrives

at the opposite result.  *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003); *Strong v. Roper*, 737

F.3d 506, 510 (8th Cir. 2013); *see also Glebe v. Frost*, 135 S. Ct. 429, 430 (2014).  A

state court "unreasonably applies" clearly established federal law when it "identifies the

correct governing legal principle from [the Supreme] Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case."  *Williams v. Taylor*, 529 U.S.

362, 413 (2000). Federal courts owe deference to the "ultimate legal conclusion reached" by a state court, "not merely the statement of reasons explaining the state court's decision." *Williams v. Roper,* 695 F.3d 825, 831 (8th Cir. 2012).

"A determination of a factual issue made by a State court shall be presumed to be correct," 28 U.S.C. § 2254(e)(1), and the petitioner has the burden of rebutting this presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Grass v. Reitz*, 749 F.3d 738, 743 (8th Cir. 2014). A state court's credibility findings are owed this same deference. *Id*. at 744; *Smulls v. Roper*, 535 F.3d 853, 864 (8th Cir. 2008) (en banc).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that counsel's performance was deficient, and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As the Eighth Circuit recently explained:

> The first prong requires a showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." The second prong requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*White v. Dingle*, 757 F.3d 750, 752-53 (8th Cir. 2014) (quoting *Strickland*, 466 U.S. at 687, 694). There is a "'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Tunstall v. Hopkins*, 306 F.3d 601, 606 (8th Cir. 2002) (quoting *Strickland*, 466 U.S. at 689). "A court need not determine whether counsel's performance was deficient . . . if it easier to dispose of an

ineffectiveness claim on the ground of lack of sufficient prejudice." *Welker v. Martin*, 131 S. Ct. 1120, 1129 (2011) (quoting *Strickland*, 466 U.S. at 697).

Because both § 2254(d) and *Strickland* are deferential, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S. Ct. 770, 778 (2011); *see also Williams v. Roper,* 695 F.3d at 831-832.

As noted above, Petitioner asserts three interrelated grounds for why defense counsel was ineffective. First, defense counsel failed to disclose the alibi defense to the state prior to trial, as required by Missouri's discovery rules; second, defense counsel never investigated, interviewed, or presented the testimony of Holmes (and other alibi witnesses) to corroborate Petitioner's alibi defense; and third, defense counsel did not submit an alibi instruction.

Petitioner contests the state courts' finding that he was not prejudiced by defense counsel's failure to disclose the alibi defense prior to trial. Petitioner disputes the factual finding of the state motion court that the only effect of this failure was the limitation on Petitioner's opening statement. Petitioner claims that, due to defense counsel's mistake, the trial court limited Bolton's testimony about Petitioner's ability to disable her alarm, as well as Petitioner's closing statement. From a review of the record, however, it is evident that the trial court's limitation on Bolton's testimony was not related to counsel's failure to file notice of an alibi defense. Rather, it pertained, as an evidentiary matter, to her capacity to testify about what Petitioner did or did not know. Additionally, the record does not support the claim that the trial court limited defense counsel's closing argument,

and defense counsel did, in fact, discuss the alibi defense in her closing argument. (Resp. Ex. A at 861-62.)

Petitioner also contends that the state courts unreasonably applied *Strickland* by ruling that the limitation on the opening statement was not prejudicial. In his attempt to demonstrate prejudice, Petitioner cites to law review articles about the general importance of opening statements. (Doc. No. 27 at 22.) Here, despite not having disclosed the alibi defense in a timely fashion, defense counsel was still able to call Bolton as an alibi witness, and she discussed the alibi defense during closing statement. Thus, it was not factually or legally unreasonable for the state courts to conclude that there was no reasonable probability that the outcome of the trial would have been different if defense counsel had been allowed to discuss the alibi defense in opening statement.

Petitioner contests the state motion court's finding that defense counsel's failure to investigate, interview, and present the alibi testimony of Holmes was neither deficient performance nor prejudicial. As noted above, the motion court inferred from the record that defense counsel's decision not to interview and present Holmes was based on counsel's preference to concentrate on adult witnesses. The Court believes this was a reasonable inference, in light of defense counsel's testimony at the state postconviction hearing that in general, she did not believe that children made good witnesses.

In any event, even if counsel was deficient in failing to interview and present Holmes, it was not factually or legally unreasonable for the state courts to conclude that there was no resulting prejudice to Petitioner. If Holmes had testified at trial consistent

with her postconviction testimony, the jury would have heard a second alibi witness (along with Bolton). But as the motion court found, Holmes was unable to account for Petitioner's whereabouts during the entire time the crime was committed. Holmes went to sleep at 9:00 p.m. on June 20, 2002, and she did not see Petitioner again until 6:30 a.m. on the morning of Chew's murder, which was completed by 5:50 a.m. at the latest.

Furthermore, the motion court's finding that Holmes was not a credible witness because she had no clear recollection of the precise date in question and was eight years old at the time of the crime is reasonable based on the postconviction proceedings. This Court will not second-guess that finding. *See Cattor v. Gammon*, 259 F. Supp. 2d 929, 933 (E.D. Mo. 2003) (holding that defense counsel's failure to investigate and present an alibi witness was not prejudicial, given that the state postconviction court found the witness's testimony not credible; and that the state postconviction court's finding was entitled to presumption of correctness under § 2254(e)(1)); *Perry v. Kemna*, 356 F.3d 880, 883-85 (8th Cir. 2004) (applying § 2254(e)(1)'s presumption of correctness to state postconviction court's determination that some witnesses were credible at postconviction hearing and other witnesses were not credible). Petitioner did not present any evidence to the state courts, or this Court, of what the other potential alibi witnesses would have said at trial.

Petitioner also contests the state motion court's factual finding that defense counsel strategically chose to forgo an alibi instruction. Petitioner claims that, rather, defense counsel mistakenly believed that, due to her failure to give the required pre-trial notice of alibi defense, the court would not allow her to give an alibi instruction. This

matter need not be resolved because the finding of the state courts that the failure to request an alibi instruction did not create *Strickland* prejudice was reasonable.  The trial court correctly instructed the jury on the elements of the crimes and the burdens of proof, and alibi evidence was presented at trial.  And the alibi defense was weak, especially in light of the evidence that Petitioner was unable, a few days after the incident, to account for his whereabouts on the night of the shooting.

Moreover, the state's entire theory was that Petitioner was present at the scene and was one of the shooters; no other theory or evidence was presented.  To have found Petitioner guilty beyond a reasonable doubt, the jury had to have rejected any notion that Petitioner was not present.  In sum, it was not factually or legally unreasonable for the state courts to conclude that there was no reasonable probability that the outcome of the trial would have been different if defense counsel had requested an alibi instruction.  *See Parreno v. Annetts*, No. 04 CIV.10153(GWG), 2006 WL 689511, at * 13-14 (S.D.N.Y. Mar. 20, 2006) (holding that counsel's failure to request an alibi instruction was not prejudicial because the jury was instructed that the state had the burden to prove every element beyond a reasonable doubt, alibi evidence was presented at trial and discussed by defense counsel in closing statement, and alibi defense was weak); *Wyniemko v. Smith*, No. 99-CV-71560-DT, 2000 WL 760704, at *8 (E.D. Mich. May 10, 2000), *aff'd*, 8 F. App'x 357 (6th Cir. 2001) (holding that counsel's failure to request an alibi instruction was not prejudicial where alibi evidence was presented at trial and counsel discussed the alibi in closing statement).  Petitioner's claim of ineffective assistance of counsel fails.

## CONCLUSION

The Court concludes that Petitioner is not entitled to federal habeas relief. The Court does not believe that reasonable jurists might find the Court's assessment of the issues presented by Petitioner's claims debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. §2254(d)(2). *See Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003) (standard for issuing a Certificate of Appealability).

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Juane Kennell for a writ of habeas corpus is **DENIED**.

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 31st day of March, 2016.